### UNITED STATES v. COTTER et al.
#### No. 458.

Circuit Court of Appeals, Second Circuit.
July 26, 1932.

Harper & Matthews, of New York City (Harold Harper, of New York City, of counsel), for appellants.

George Z. Medalie, U. S. Atty., of New York City (Alvin McKinley Sylvester, J. Edward Lumbard, Jr., Joseph E. Brill, Paul Williams, and James A. Austin, Asst. U. S. Attys., all of New York City, of counsel), for the United States.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

Seven defendants were indicted for using the mails in the fraudulent sale of mining stock. There were twenty-four counts, one for the posting of each of twenty-four letters in pursuance of a single scheme, and a twenty-fifth count for conspiracy. Of the seven indicted the jury acquitted one, Schirp, disagreed as to another, George Ewald, and found guilty the appellants Cotter and Mitterlechner and their corporation. Two others, Bins and Louis Ewald, were not put to trial. As Mitterlechner failed to complete his bill of exceptions, and as the indictment is good in substance, we have nothing before us as to him. The appeals of Cotter and the company alone require discussion, but since these involve all the questions which Mitterlechner could raise, he has not in fact suffered by his default.

The scheme was of a kind familiar in New York, and especially easy to perpetrate in 1929 and 1930, when it was chiefly executed. In June, 1928, Cotter, who had long since acquired mining claims in Montana, conveyed them to a company, taking back all the shares. A large number of these, made available to the company by a series of contracts not necessary to describe, he sold to the public by means of various deceits, the most important of which was, that none of the officers were getting anything out of the sales. In fact they collectively got about ninety thousand dollars, and probably more. Beside this ran the usual obbligato of dishonest and lurid puffing, the common tactic which has so often proved successful with guileless investors of small means. The appellants conceded upon the argument that a case for the jury had been made out, and though they argue in their reply brief, filed later, that it was not "clear and convincing," that is not true, and it would make no difference if it were, for all such questions are ended by verdict. We pass therefore to the supposed errors in the conduct of the trial, which alone need concern us.

The first involves a supposed irregularity in the verdict. The jury, who had been out for twenty-eight hours after a trial of over six weeks, returned and reported that they had reached an agreement as to all the defendants but Ewald. They found the company guilty on all counts; Cotter and Mitterlechner on the twenty-fifth, or conspiracy, count; Schirp not guilty. The verdict had not yet been recorded, when, upon the judge's inquiry as to their disposition of the other counts, they answered that they had thought one count was enough. He sent them back to answer as to the other counts; and, although it is not absolutely clear, we may assume that they were given to understand that their deliberation was over as to the twenty-fifth. Later they came in and found a verdict against the company as before, against Cotter and Mitterlechner on the first and twenty-fifth counts, but still disagreed about Ewald. They were sent out a third time without success and were finally discharged.

The first objection is that they originally found for Cotter and Mitterlechner except as to the conspiracy count. This is not true; the judge's questioning made it clear that they had not considered the other counts at all; indeed they expressly said so. In finding out what they really meant, he was right. U. S. v. Beadon, 49 F.(2d) 164 (C. C. A. 2). Next, it is suggested that they were unduly pressed, but this is so plainly without foundation that we need not pause to discuss it. Finally, as we understand it, the argument is that no verdict should have been recorded until they had disposed of the whole case. Nobody can suppose that it was irregular to take a verdict against some and a disagreement as to others; the statute itself allows it (section 566, title 18, U. S. Code [18 USCA § 566]), and it is done every day [Workin v. U. S., 260 F. 137, 141 (C. C. A. 2); Donegan v. U. S., 287 F. 641, 649 (C. C. A. 2)]. The point appears to be that until they are through with all, the fate of all must hang in the balance; they should have been allowed to reconsider. There is not the slightest reason for this. In this case they had concluded as to the appellants and wanted no more time. It would only promote irresponsible hesitation to tell them that they must reserve their decision altogether until they got through; the appellants had no right in their subsequent vacillations. The practice adopted

promoted despatch and did not impair the fairness of the trial; it was expressly accepted in the only case we have found, and that too a conviction of murder in the first degree. People v. Cohen, 223 N. Y. 406, 431, 432, 119 N. E. 886.

■ The next point arises from what the prosecution said in its address to the jury. The defendants had been investigated by the state authorities and retained one, Delehanty, as their lawyer. He advised them as to what they should do, and they kept on in the business. In their own addresses to the jury they had argued that they could not have been acting in bad faith because so respectable a counsellor would not have countenanced ill doing. To this the prosecution retorted that if so, they should have called him, which the prosecution could not do, the communications between them being privileged. At the end of the addresses the appellants excepted to this statement because it appeared, so they said, that the privilege did not exist; other persons than the clients had been present when the advice was given. They might have added that their own argument was itself an abandonment of any privilege whether it had originally existed or not. They did not then ask the judge to act, but later requested him to charge that Delehanty was equally available to the prosecution because others had been at the interview. This he refused to do, being uncertain in his recollection as to who in fact had been present. He contented himself with charging that if outsiders had attended, there was no privilege, which was abstractly a correct statement of the law. He did not say that if the privilege existed, the prosecution's argument was not justified, and he was not asked to do so.

Part of the prosecution's argument was proper; part was not. So far as it answered the appellants' own argument based upon Delehanty's advice to them to go on with the business, it was fair to reply that if they relied upon him, they should have called him. Clearly they had laid themselves open to that retort, and could not invoke a privilege they had by implication yielded. The only possible objection was to the added statement that the prosecution could not have called him. So far as the door was opened by the defendants' argument, practically the prosecution could not have called him; the argument came after the case was closed. But if there had been outsiders at the interviews the privilege had never existed; so far as this was true, and so far alone, could there be any

complaint. We may assume that in fact there were such outsiders and that there had been no privilege.

We agree indeed that the contents of privileged communications cannot by inference be drawn out indirectly; one party may not ask a jury to find that they would have been prejudicial to the party having the privilege. Pennsylvania R. R. v. Durkee, 147 F. 99 (C. C. A. 2). Again we agree that the course adopted by the trial judge was not right; he should not have left the question to be decided by the jury. Wigmore, § 2550. Although it involved a preliminary question of fact, that is, whether there had been others present, this he should have decided himself, like any other question of fact on which the admission or exclusion of evidence depends, for he was really dealing with the admissibility of evidence, though it was that to be drawn from conduct, i. e., the failure to call a witness. Thus he made it possible for the jury to find that there had been no one else present, and that for this reason the prosecution could not have called Delehanty. Nevertheless, we will not reverse a judgment ending so long a trial upon such slight grounds. To treat it seriously we must suppose that the jury found that the prosecution would have called Delehanty if it could, and that he would have damaged the defendants. But Delehanty was a lawyer of standing, and it was not likely that he would have heard more of any wrong-doing than they were willing to correct. The record contained testimony that he did tell them to correct a part of what they had done. Amid so much direct proof of guilt, we cannot suppose that his entirely putative testimony counted at all, so far as its substance had not already appeared. The error seems to us to fall within section 391 of title 28, U. S. C. (28 USCA § 391). Meyer v. U. S., 258 F. 212, 215 (C. C. A. 7); Hunter v. U. S., 264 F. 831, 833 (C. C. A. 5); Fitter v. U. S., 258 F. 567, 570–573 (C. C. A. 2); U. S. v. Heitler (D. C.) 274 F. 401, 409–411; affirmed (C. C. A.) 289 F. 1021 (C. C. A. 7); Silent Automatic Sales Co. v. Stayton, 45 F.(2d) 471, 475, 476 (C. C. A. 8).

■ A kindred point depends upon another argument of the prosecution as to four other witnesses concededly available to both sides. Here also it asked the jury to conclude that they would have sworn against the defendants, because they did not call them. To correct this the appellants asked the judge to charge that since either side might have called the witnesses, the jury should make no as-

sumption about what they would have said. These requests were two of about a hundred and fifty submitted by all the defendants. We have again and again protested against such multiplicity; it serves merely to impede the trial and entrap the judge. While we cannot hold that a judge may disregard all requests even in such numbers, it comes almost to that; if parties will insist upon them, they must be content with short shrift. However, it was not wrong to refuse them. When both sides fail to call a witness who knows something of the facts, their conduct, like anything else they do, is a circumstance which a jury may use. If both can call him and he is impartial, ordinarily it will have little weight; if it appear that he would naturally side with one party, it is reasonable to expect that he does not use him for good reason; and that is fair argument for the other. More so, if he is only available to one who alone knows the facts, and there is no other evidence on the issue. Perhaps, as Professor Wigmore puts it (section 288), an inference is, strictly speaking, always proper against each side, but of different weight. Mitchell v. R. R. Co., 68 N. H. 96, 116, 34 A. 674. A judge is not required to intervene here any more than in any other issue of fact. He must indeed, as he always must, keep the prosecution in a criminal case within bounds; he must not allow it by implication to invoke unsound legal doctrines (Graves v. U. S., 150 U. S. 118, 14 S. Ct. 40, 37 L. Ed. 1021); just as he must keep passion out of the debate and hold the parties to the issues. But he is not charged with correcting their non sequiturs; the jury are to find these for themselves. So the judge in the case at bar was not required to correct the argument, that the failure of the defendants to call the four witnesses was a ground for supposing that they would swear against them. He might have done so, but he need not; so far as we know, Sears v. Duling, 79 Vt. 334, 65 A. 990, is the only decision to the contrary and it does not persuade us.

■ The third point is as to the prosecution's use of testimony taken before the grand jury. Cotter, Mitterlechner and Schirp had all appeared there; the first two only to identify the corporate books. They both took the stand at the trial and swore to the existence of other books than those which they had originally produced; and upon cross-examination the prosecution used their earlier testimony to contradict them. Later Cotter's counsel demanded a general inspection of the minutes, which the judge refused, though he went over them himself, decided what parts were relevant, and laid so much open. Schirp, the defendant acquitted, had apparently testified more generally before the grand jury; upon cross-examination at the trial he was confronted by the minutes to contradict him and establish admissions. The defendants demanded the right to inspect all his testimony also, and the judge adopted the same course.

It is indeed true that the prosecution having used the former testimony, the defendants were entitled to put in such other parts as threw light upon it. Wigmore, § 2113. Nor is this right secured by the judge's going over the record for himself and selecting so much as he thinks relevant. The party must be allowed an inspection for himself; not of the whole minutes of course, but of the whole evidence of the witness. This does not invade the secrecy of the grand jury; it is not an inspection of the minutes preparatory to trial and in invitum, which is in no circumstances permissible. U. S. v. Violon (C. C.) 173 F. 501; U. S. v. Garsson (D. C.) 291 F. 646; U. S. v. Herzig (D. C.) 26 F.(2d) 487. But when the prosecution chooses to open them, the time for secrecy has passed; fair dealing requires that the other side shall inspect them freely.

However, we cannot say that the judge hurt the defendants, though his refusal was wrong. We do not know whether there were other passages than those he selected which were pertinent, or whether if there were, that they were of moment. It is extremely unlikely that either is true as to Cotter and Mitterlechner, whose testimony had been so circumscribed. As to Schirp, his admissions, if there were any, were not competent affirmatively in favor of the appellants, nor was his cross-examination. It is true that there may have been passages omitted which might serve to break the force of those used against him; but that could not concern Cotter and Mitterlechner. Moreover, the minutes are not in the record, and no effort was made to get them in. The appellants might have asked that they be incorporated into the bill of exceptions, and if the judge had refused, they could have come to us by motion to correct the bill. They chose to rest upon the bare denial of their right; and we cannot say that they were damaged. Cf. U. S. v. Rosenfeld, 57 F. (2d) 74, 76 (C. C. A. 2).

■ The next point concerns the admission of documents. The prosecution wished to trace

to the appellant and Schirp some of the proceeds of the shares sold. To do so it offered in evidence their deposit slips, and the sheets of the banks' ledgers recording their accounts, to which the defendants unsuccessfully objected on the ground that they were "incompetent and immaterial." The objection was probably meant only to raise the point that the evidence was not related to any defendant except him whose account was so recorded; and so far, it was clearly bad, for there was ample evidence of concert between them all. However, it may also have meant that the documents had not been properly authenticated by first hand proof; that they were hearsay; though this was nowhere intimated; there was not even an allusion to the incompleteness of the proof. Different reasoning governed the competency of the deposit slips and the ledger sheets. The first are ordinarily made by the depositor personally, or by some one authorized by him. They are not competent, taken alone, without proof of their emanating from one or the other, and there was no such evidence. But they become competent, if the items are entered in the depositor's account and go into his balances, and his books are struck and his vouchers returned. Thus, the ledger sheets in which the accounts were kept if themselves competent, authenticated the deposit slips; and the question comes to whether they should have been admitted.

█ The law has much changed as to such documents; it is no longer always necessary to produce the original entrants and make a complete chain of direct proof. We discussed the question last in Massachusetts Bonding Co. v. Norwich Pharmacal Co., 18 F.(2d) 934, where we said that the extent to which the entrants must be produced depended upon their accessibility, and how far their testimony would substantially verify the document. In the case of a bank, the accuracy of whose records is essential to the very life of its business, and where, because of the multitude of transactions, the entrants can do no more than describe the system and say that they followed it, it is not necessary to go further than prove that the ledgers were kept by a system likely to insure accuracy, and that they appear to be regular on their face; the other side must discredit them. So far as this be an extension of what we said in Massachusetts Bonding Co. v. Norwich Pharmacal Co., we take the step; for the probable correctness of ordinary bank books far outweighs any protection to the other side, af-

forded by emptying the bank of much of its clerical force. Unless the system under which they are kept is defective, the danger of mistake is slight and in any event the putative corroboration by the entrants is inappreciable. The Civil Practice Act of New York (section 374-a), has already gone further in civil suits. That of course does not control here, but it does serve to show the inapplicability to present-day conditions of rules made for a simpler society, where the automatic recording of voluminous transactions had not yet become reliable, and relied upon without question. To be sure the prosecution did not here prove even that the bank's ledgers were kept by a regular and adequate routine; though, had the objection been made, this could probably have been supplied. Perhaps the point was not raised just for that reason; but in any event the judge could not divine that this was the purpose of the objection. He was justified in supposing that no further verification was being demanded.

█ Schirp took the stand in his own behalf and was cross-examined. He testified that he became concerned about the character of the business, but was reassured after Delehanty had been consulted, and had told them that their affairs had been "straightened out." He was asked whether he would not have left the company, had he supposed that the "participation agreements" had not been cancelled, these being a means by which the conspirators were to get a part of the proceeds from the sale of shares. Later he was asked whether he did not consider the conduct of the business "irregular." To both these questions Cotter objected because they called for the witness's "opinion." Schirp being himself on trial, the questions were to test his own good faith; to secure if possible an admission that though he knew the business to be a fraud, he kept on selling shares. This alone made the evidence competent; so far as incidentally it affected the guilt of the others it was inevitable when they were being tried along with him. The most that the judge need have done was to tell the jury that they should not impute Schirp's guilty knowledge to the rest; no one asked him to do so. The point is however not quite this, but that the questions called for "conclusions." No rule is subject to greater abuse; it is frequently an obstacle to any intelligible account of what happens. Most witnesses will tell their story in colloquial speech which skips the foundations and runs in terms of the "ultimate facts." Ordinarily, they tell it

much more plainly in this way, and the warrant for what they say can be perfectly probed by cross-examination. No doubt, when the thread of the testimony need not be broken, or the witness so nagged as to become inarticulate, it is best to confine him so far as possible, to the details of what he has seen and heard, though these are really as much "conclusions" as anything else; but the degree of this should be substantially left to the judge who conducts the trial. Central R. R. v. Monahan, 11 F.(2d) 212, 214 (C. C. A. 2). Courts have indeed at times used such points as make-weights for reversal [Porter v. Davies (C. C. A.) 223 F. 451, 465; U. S. v. Harris, 45 F.(2d) 690 (C. C. A. 2)]; ordinarily they do not count at all. They should not here.

■ The company protests against the fine levied against it. It argues that this merely takes from the victims of the fraud, assuming that there was a fraud, part of the little that was left them. We agree. Why it should promote observance of the law to put into the treasury money of which innocent persons have been robbed, is not apparent. But it is a matter with which we have nothing to do; the company was a juristic person to which, by a fiction, criminal responsibility is imputed. It could commit a crime and be punished in the only way it could be made to suffer. Where the burden falls, the trial judge must consider; we have no power to change his decision. So far as our opinion may be thought of consequence in other cases, we may however say that when the company is insolvent, as it always is, we can see no good reason for more than nominal punishment.

The appellants have presented a number of other points, but it is not necessary to discuss them. They presuppose that we would reverse a judgment clearly justified by the evidence for trivial lapses made at trial. Substantially all were not errors at all, but, so far as any exist, they are inappreciable in the vast morass before us. Criminal prosecutions are not to test the trial judge's adeptness in answering questions of law, put to him in multitude, often in the heat of sharp dispute. Trials are to winnow the chaff from the wheat; when the accused has had fair opportunity to answer the charge; when it has been lawfully proved, and fair men have found him guilty, our duties end. There can be no question that these conditions were here fulfilled.

Judgments affirmed.