**UNITED STATES v. FRANKEL.**
**No. 347.**

Circuit Court of Appeals, Second Circuit.
May 8, 1933.

MANTON, Circuit Judge, dissenting.

———

Herman H. Levy, of New York City, for appellant.

George Z. Medalie, U. S. Atty., of New York City (Paul Whitcomb Williams, Asst. U. S. Atty., of New York City, of counsel), for the United States.

Before MANTON, L. HAND, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

Frankel was indicted for importing into the United States one hundred and ten pounds of heroin and about six and a half pounds of morphine in a traveling bag concealed in a case of toy lanterns. The case was tried to a jury, which found him guilty on both counts and he was sentenced to eight years' imprisonment and a fine. The chief question is of the sufficiency of the proof, though questions also arise as to the conduct of the trial. We address ourselves first to the evidence. Five cases arrived in the port of New York on L'Ile de France, on April 6, 1932, consigned by Bernard & Co., Paris, to Bernard & Co., New York, a well-known and reputable firm of freight forwarders and custom brokers. The Paris house sent a copy of the bill of lading to the New York house, accompanied by a letter saying that the shipper had given no name, and that the cases were to be delivered to the holder of the bill of lading. The bill of lading and the ship's manifest recited that the cases contained toys. On the next day, the customs officials, having obviously been put on scent, opened one of the cases and found a traveling bag, concealed between layers of toy lanterns, containing heroin and morphine of great value. They then closed up the case and left it on the wharf as before. On the following day they opened the other cases, but found only toys. On the morning of the seventh Bernard & Company got a telephone call from an unknown person, asking whether the cases had arrived, and answered that the consignee must send down a shipper's invoice and bill of lading; and an unidentified messenger delivered these to the brokers that morning. Early in the afternoon a man, describing himself as Guntal, telephoned and asked if they were preparing the entry. They answered that the consignee must sign the entry papers, either coming himself or receiving them by messenger. The supposed Guntal answered that he would come himself, but later called and said that he would send a messenger to pick up the papers. A messenger boy, one Lewit, soon arrived and took up the customs entry form, a bill of Bernard & Company for their charges, and a letter addressed to Guntal. The customs officials, who were in waiting, followed the boy to a building on Madison avenue at Forty-Third street, where he met Frankel at the entrance, who took him inside and received the papers from him. Frankel was then arrested and taken to customs headquarters with the boy. On his person, besides what the boy had given him, were found a copy of the letter from the Paris house of Bernard & Company to the New York house, and three copies of the shipper's invoice, identical with the copy received that morning by Bernard & Company, except that the name, "Albert Guntal," was not filled in where the blank appeared for the consignee's name. The shipper's name appeared on all three copies, but no such person could be found in Paris at the address written.

When examined by the officials Frankel said that he had been shopping for toys at Fourteenth street and Sixth avenue, and had bought toys from a man in a grey overcoat, who gave his name as Guntal, whom he had never met before, and whose residence or place of business he did not know. His story left it to be inferred that this man had given him the papers, and that he had paid for them, though this he did not expressly declare. At the trial he said that he was a dealer in toys and had known Guntal for a year and a half. He had negotiated with him on the sixth for four cases of toy lanterns of which Guntal showed him samples. They had an appointment at Guntal's office on the next day, and he chanced upon him at the door. Guntal stopped a boy whom he picked up on the street, and sent him on the errand to Bernard & Company. They then went to a restaurant for coffee, which Guntal left, but not until Frankel had agreed to consider buying four of the five cases at $110 a case. The fifth Guntal had already sold. Leaving hurriedly to pay the duty, $330, Guntal left under Frankel's hat the papers found on his person, and he picked them up to keep them. Guntal had asked him to meet the boy and gave him fifty cents to pay him. The boy asked for Guntal when he came back; Frankel answered that Guntal had had to leave, and the boy pointed out where he was to sign. As Frankel was taking out his glasses to read, he was arrested.

Lewit, the messenger, swore that he had been on Madison avenue, when Frankel had hailed him and asked him to do an errand. He was to go to Bernard & Company, get some papers held by them in the name of Guntal, and bring them back to him. Lewit asked him for a card which he refused, so he used one of his own, and at Frankel's direction wrote down the name, Hult, the person in Bernard & Company who had answered the telephone. Frankel said that his own name was Albert Guntal, and the boy also wrote on the card, "Al Guntal." His exact testimony as to this is as follows: "I asked him who shall I say the papers are for when I go down to the office, and the man who stopped me said that his name was Guntal; and

I wrote down, 'Al Guntal.' Q. This man said his name was Albert Guntal? A. That is right." Lewit added that there was a man with Frankel in a grey overcoat, who wore glasses, and whom he identified as Frankel's brother-in-law, Simons, when shown Simons' photograph. Frankel had told him to come back to the building where he would wait, and the boy did so; on his arrival Frankel told him to come inside the building. He did, and showed him where to sign, giving him the papers, which he put into his pocket. After getting fifty cents for the errand Lewit left the building and was arrested. Simons was called and denied that he was with Frankel on the seventh. This is a résumé of all the evidence, except the testimony of character witnesses.

It seems to us, not only that a jury might have found the defendant guilty of importing the drugs, but that it was inevitable that they should do so. That the drugs were imported is plain; the alternative is that so valuable a parcel should have been concealed in the case after it reached the port, which considering its value and the method of its packing, appears to us fantastic. The only question was as to the identity of the confederate on this side who was to receive them, for some confederate there must have been; men do not conceal such valuable property in a case of toys on the chance that it will be bought at a satisfactory price upon its arrival. The person who called up Bernard & Company on the morning of the seventh and sent down the papers, was presumably the confederate, or some one acting at his direction. If there was a Guntal and he did this, Guntal was the importer or his accomplice. Indeed, this was the necessary import of Frankel's own story. But Guntal might not have existed at all, or if he did, Frankel and he might have been acting in concert. The jury had indeed to be satisfied of this in order to convict; but they had ample basis for so finding. Frankel, being found in possession of documents which must have been sent to the confederate, tried to exculpate himself by his explanation. Had he bought all five cases, that explanation would have been preposterous. The supposititious Guntal, who knew of the presence of the drugs in one of the cases, would obviously not sell it, along with the other four at any such price as $110 a case. Nobody would believe that. Frankel did not say so. He said that Guntal told him that he had sold one, and was to sell to Frankel only four, the arrangement being that these cases should be brought to Guntal's place where Frankel might look them over. Guntal meant to take charge of the entry himself, and only by inadvertence, when called away to get money to pay the duties, left the incriminating papers for Frankel to pick up. This story was possible, though not probable, but it was directly contradicted by Lewit, who testified that Frankel, not Guntal, sent him on the errand originally, and told him to ask for Hult and that his own name was Guntal. Frankel did not even suggest that Guntal had given him Hult's name; he could only have got it in case he himself had called up Bernard & Company. Moreover, on his arrest Frankel told a somewhat different story. Then he met Guntal at another place, and bought of him apparently all five cases; at least he spoke of buying the toys as though he meant all those described in the documents found on his person. Perhaps it is not fair to press too far his failure at that time to distinguish between the four which he later said that he considered buying and all five. Nevertheless the fact remains that originally, although he knew that the inquiry involved the goods mentioned in the papers, and that in some at least drugs had been found, he did not suggest the distinction which later became the necessary foundation of his defence. Lewit was entirely unimpeached; the explanation was farfetched and inconsistent; we have no doubt of the defendant's guilt.

█ Of the supposed errors in the conduct of the trial the most important is the admission of the telephone talks in which an unknown speaker, who the second time called himself Guntal, asked for the goods and later said that he would come or send for the papers. The usual rule of course is that in the absence of some proof of the identity of the speaker, the declaration is not competent; and ordinarily the witness must recognize the declarant's voice. Robilio v. U. S., 291 F. 975, 982, 983 (C. C. A. 6); Lewis v. U. S., 11 F.(2d) 745 (C. C. A. 6); Murphy v. Jack, 142 N. Y. 216, 36 N. E. 882, 40 Am. St. Rep. 590. However, Lewit supplied the identification when he swore that Frankel told him that he was Guntal, and gave him the name of Hult. Besides, the testimony was either competent, or not prejudicial. If there was a Guntal and he was Frankel's confederate, the declaration was admissible by familiar law. If there was no Guntal, Frankel, who used the name later, was using it earlier that day; at least a jury might say so. If Guntal was acting on his own account, as Frankel insisted, it was not prejudicial to allow it to appear that he was the importer. That was indeed the whole purport of Frankel's defence.

■ On cross-examination the defendant was asked whether he had failed in business and whether he had had a similar unfortunate occurrence with the importation of other merchandise. He answered each question in the negative and no prejudicial testimony therefore got before the jury. The argument is that merely to put the questions was reversible error, objection having been made to both, and exception taken to the first, though not to the second. The first question was certainly harmless, and we should be unwilling to reverse on the mere chance that from the putting of the second, the jury, in the face of the defendant's denial, inferred that he had in fact been guilty of earlier customs frauds. During their deliberations they did indeed ask if the defendant had been indicted or tried for smuggling. But their very inquiry showed that the question had at most done no more than suggest the possibility; not that they so understood. Such speculation cannot be the basis of upsetting a verdict in so plain a case. Finally, he was asked whether he had changed the name of his company because he had had "trouble" with a finance company, to which he answered, "partly." The implications were somewhat uncertain, but the most damaging were that the "trouble" had arisen because of some sharp practice. This appears to us close enough to the issue of his veracity to justify the question. Wigmore, § 982. The defendant called his brother-in-law, Simons, to establish that he was not with him on April seventh. On cross-examination the prosecution asked whether the government had not made claim against a company with which both he and Frankel were connected because of the fraudulent withdrawal of imported goods. The judge refused to allow the question, and told the jury to disregard it. That was all that could be done; we need add nothing to what we said as to the defendant's cross-examination. We do not therefore find it necessary to pass upon the propriety of the question.

■ In his charge the judge told the jury that the boy, Lewit, seemed to him "frank" and "open" without any "particular interest in this controversy," and that he doubted his pliancy to the influence of the officials. Further he called their attention to the improbability that the putative Guntal should have dealt with the cases as Frankel said he did; that with every allowance there was something left to explain. He concluded by telling them that the issue of intent was one which they must solve in their own way, and on their own responsibility. All he could do was to guide them and "in the last analysis the question of guilt is for you to determine and for you alone to determine." This was quite within the bounds of propriety. Rucker v. Wheeler, 127 U. S. 85, 93, 8 S. Ct. 1142, 32 L. Ed. 102; Lovejoy v. U. S., 128 U. S. 171, 172, 9 S. Ct. 57, 32 L. Ed. 389; Graham v. U. S., 231 U. S. 474, 480, 34 S. Ct. 148, 58 L. Ed. 319; Dillon v. U. S., 279 F. 639 (C. C. A. 2); Robinson v. U. S., 290 F. 755 (C. C. A. 2). The charge was by no means so argumentative for instance, as my own in U. S. v. Safford, which this court affirmed. Safford v. U. S., 252 F. 471. It did not approach what the Supreme Court upheld in Horning v. District of Columbia, 254 U. S. 135, 41 S. Ct. 53, 65 L. Ed. 185. No doubt there may be cases where in spite of the final admonition that the facts are for the jury, a judge may go too far in summing up the evidence; that is a question not susceptible of general answer. But that he is free, not only to give his impressions of the witnesses, but to point out the rational implications of the evidence, is too well settled in federal trials to admit of any dispute.

■ While the jury were out they sent a message asking whether the defendant had ever been indicted or tried for smuggling or the like. The judge answered that so far as the record showed he had never been convicted. The argument is that by innuendo the answer left it to be inferred that he had been indicted, and that this was a serious error. The defendant did not so much as intimate at the time that the answer was equivocal, or that it implied that he had been indicted or tried. So far as appears, the judge supposed that it was comprehensive, and apparently the defendant thought so too. To seize upon it now, without any contemporaneous objection or exception, is quite unwarranted. It would almost certainly have been corrected. Few records could survive such scrutiny, and justice to the prosecution requires that what has once been accepted, shall not later be unraveled. In a very serious matter perhaps we might intervene even when the mistake would have been corrected, but the prejudice here was wholly inferential and speculative, and the guilt, clear.

■ The jury first brought in a verdict on the conspiracy count and reported that they could not agree as to the other. The judge recorded the partial verdict and sent them back to deliberate upon the importation count. We have recently upheld this practice. U. S. v. Cotter, 60 F.(2d) 689. His language in urging the jury to agree was clearly not coercive. Shaffman v. U. S., 289

F. 370 (C. C. A. 3). The charge that circumstantial evidence may at times be better than direct was entirely proper, and patently true. Wigmore, § 26. We have recently considered this question. United States v. Becker (C. C. A.) 62 F.(2d) 1007, 1010.

Judgment affirmed.

MANTON, Circuit Judge, dissents without opinion.