UNITED STATES of America, Appellee,

v.

Anthony DiLAPI and Benjamin Ladmer, Defendants-Appellants.

Nos. 636–8, Docket 80–1337, 80–1373, 80–1375.

United States Court of Appeals, Second Circuit.

Argued Feb. 4, 1981.

Decided June 9, 1981.

Ronald Meister, New York City (Daniel J. Kornstein and Kornstein, Meister & Veisz, New York City, on the brief), for defendant-appellant Anthony DiLapi.

Gerald Shargel, New York City (Graham Hughes, New York City, on the brief), for defendant-appellant Benjamin Ladmer.

James Harmon, Jr., Organized Crime Strike Force, Brooklyn, N. Y. (Edward R. Korman, U. S. Atty., Thomas P. Puccio and Douglas Eric Grover, Organized Crime Strike Force, Brooklyn, N. Y., on the brief), for appellee.

Before FEINBERG, Chief Judge, NEWMAN, Circuit Judge, and MISHLER,* District Judge.

NEWMAN, Circuit Judge:

Appellants Anthony DiLapi and Benjamin Ladmer were convicted by jury trial in the Eastern District of New York (Henry Bramwell, Judge) for obstruction of justice and conspiracy to commit that offense, 18 U.S.C. §§ 1505 and 371 (1976), in connection with the filing of a representation petition with the National Labor Relations Board (NLRB). Appellants raise several challenges on appeal including claims that the verdict may not have been unanimous and that the Sixth Amendment was violated by an instruction to DiLapi not to consult with counsel during a trial recess in the course of his testimony. Concluding that none of the claims warrants reversal, we affirm the convictions.

I.

In 1978, Matthew Eason, a union organizer and president of Local 20408 of the United Warehouse Industrial and Affiliated Trades Employees Union, filed a representation petition with the NLRB for certification as the collective bargaining agent for the employees of two employment agencies, GS Temporary Service, Inc. and GS Supply Associates, Inc. (hereafter collectively "GS"). GS provided employees for Interstate Dress Carriers, Inc. ("Interstate"). GS was apparently formed at Interstate's request after Interstate had entered into a collective bargaining agreement with the International Ladies Garment Workers Union (ILGWU) at the end of 1976. At that time, approximately three-quarters of Interstate's employees at its Jersey City facility were transferred to the payroll of GS. Since GS provided these employees to Interstate as "temporary help," they were no longer covered by the union contract with Interstate.

Soon after Eason filed his petition to have Local 20408 represent the GS employees, he received several telephone messages from appellant DiLapi, an organizer for Local 522 of the International Brotherhood of Teamsters. Eason eventually agreed to meet DiLapi to discuss the GS petition at Eason's office on April 12, 1978. The core of the trial concerned this and various other meetings between Eason and appellants at which appellants allegedly attempted to induce Eason to withdraw the petition by means of threats, bribes, and an offer of ILGWU membership for GS employees to be designated by Eason.

Just before the April 12 meeting, co-defendant David Bergner, an attorney whose office was on the same floor as Eason's office, approached Eason and told him that the persons Eason was about to meet were "nasty boys," affiliated with organized crime, who "would think nothing of handing [Eason his] head" if he did not cooperate. After Bergner left, DiLapi arrived with appellant Ladmer, co-defendant Stephen Kingston, president of DiLapi's Local, and a fourth, unidentified individual. Ladmer, an officer of the International Production, Service and Sales Employees Union, had met Eason in 1977 in connection with the withdrawal of a different NLRB petition involving the A. R. Winarick Company. The president of Ladmer's union, co-defendant Robert Rau, had, at DiLapi's request, asked Ladmer to introduce DiLapi to Eason.

After the introductions, at DiLapi's request the others withdrew, and DiLapi then offered Eason $1,000 to withdraw the GS petition and threatened him with harm if he would not do so. Eason told DiLapi he would have to think about it, and the meeting ended. Ladmer returned and, outside

* The Honorable Jacob Mishler of the United States District Court for the Eastern District of New York, sitting by designation.

of DiLapi's presence, offered Eason $300 as a payment for the way he had cooperated with Ladmer in their prior dealing involving the Winarick petition. After the meeting, Eason contacted various law enforcement and government agencies and was put in touch with the Federal Bureau of Investigation (FBI). Eason agreed to continue to meet with DiLapi and record all subsequent conversations. The tapes of those conversations were entered into evidence at the trial.

In the first taped conversation, a meeting on April 20 between Eason and DiLapi, DiLapi repeated an offer made earlier to admit 10 GS employees, designated by Eason, into Local 102 of the ILGWU, and mentioned that he did not want to "press" Eason. As no further meetings were planned, Eason spoke to an FBI agent and was advised to arrange another meeting. Eason then contacted Ladmer and asked Ladmer to serve as his "intermediary" in arranging another meeting with DiLapi. In that conversation, which Eason recorded, Ladmer agreed to set up a meeting for April 24 in Ladmer's office.

At the April 24 meeting, which was recorded, Eason, Ladmer, and DiLapi discussed how much money Eason would receive for withdrawing the petition. Eason was told not to mention any figures aloud but to write them down on a piece of paper, as DiLapi was apparently concerned that Ladmer's office might be bugged by the FBI. At one point Ladmer indicated on the paper that the amount would be $3,500. DiLapi stated that if Eason did not cooperate, GS would simply go out of business and regroup under another name, and as a result, the current GS employees would not be rehired.

A few days later Interstate transferred its Jersey City employees to Manhattan, an action calculated to undermine Eason's organizing efforts because his petition only covered Jersey City workers. The following day, Eason met with Interstate's vice-president, Sidney Lieberman, and in a recorded conversation, Lieberman indicated his awareness of the prior approaches by DiLapi and increased the offer to $5,000. He then paid Eason $2,000 "front money" and agreed to place 10 men of Eason's choosing into ILGWU Local 102, in exchange for withdrawal of the petition. Interstate and Lieberman, along with ILGWU Local 102 and its manager, Sidney Gerstein, were also charged as co-defendants in this case.

All of the defendants testified at the trial, attempting to offer a theory to contradict the Government's contention that the defendants corruptly sought to induce the petition's withdrawal at the request of the employer Interstate. Defendants maintained that DiLapi's union, Local 522, wanted to organize the GS workers, and that they were merely offering to compensate Eason's union for actual expenses incurred in its organizing efforts if it withdrew in favor of Local 522.

The indictment alleged in the substantive count (Count One) that both appellants and others endeavored to influence, obstruct, and impede the administration of the law under which the GS representation proceeding was being conducted by the NLRB. Count One alleged that the obstruction of justice was accomplished by several acts— offering and paying Eason a sum of money, offering membership in Local 102 to persons designated by Eason, and threatening Eason with physical harm, economic injury, and the employees' loss of employment if he did not withdraw the GS petition. The District Judge's instructions made clear that a request to withdraw a representation petition would be a crime only if it were made corruptly or by threats of force, and that the endeavor would be corrupt if, through payment of money to Eason or admission of persons into Local 102, the endeavor sought to prevent employees from organizing or to preserve a system of kickbacks. By their verdicts of guilty against appellants,[1] the jurors rejected the defense

---

1. Four defendants, Bergner, Kingston, Rau, and Interstate, were acquitted. Of the remaining three defendants, Lieberman was severed because of his illness mid-trial, and he is awaiting

claim that reimbursement of expenses had been legitimately offered, and accepted the Government's contention that threats or corrupt means had been used in an attempt to force withdrawal of the GS petition.

## II.

*Trial Court Jurisdiction*

■ Preliminarily, appellants contend that the District Court lacked jurisdiction to conduct the trial because, when the trial started, there was pending in this Court a petition seeking rehearing of an interlocutory appeal. Appellants had initially moved in the District Court to dismiss the indictment on grounds of double jeopardy. That motion was denied, and, upon an interlocutory appeal, *see Abney v. United States*, 431 U.S. 651, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977), this Court affirmed. *United States v. DiLapi*, 616 F.2d 613 (2d Cir. 1980). The opinion of affirmance was filed February 19, 1980, and contained a direction that the mandate issue "forthwith." The records of this Court reflect that the mandate in fact issued on February 21, 1980. Subsequently a timely petition for rehearing was filed pursuant to Fed.R.App.P. 40. Appellants moved in this Court to stay the trial, and this Court denied that motion on April 18, 1980. Trial commenced April 21, 1980. The petition for rehearing was denied April 28, 1980.

The issuance of the mandate from this Court terminated this Court's jurisdiction. *Gradsky v. United States*, 376 F.2d 993 (5th

Cir.), *cert. denied sub nom. Grene v. United States*, 389 U.S. 908, 88 S.Ct. 224, 19 L.Ed.2d 224, *vacated in part on other grounds sub nom. Roberts v. United States*, 389 U.S. 18, 88 S.Ct. 1, 19 L.Ed.2d 18 (1967); *United States v. Eisner*, 323 F.2d 38, 42 (6th Cir. 1963). The filing of a petition for rehearing did not revest jurisdiction in this Court, as appellants apparently recognized by moving to stay the trial. Had this Court been disposed to grant the petition, it would have had to recall the mandate.[2] In the absence of a recall of the mandate or a stay of the trial, the District Court was entitled to exercise the jurisdiction it acquired upon the issuance of the mandate from this Court.[3]

*Unanimity of the Jury Verdict*

During its deliberations, the jury sent a series of notes to the Court, which led to the note that is the focus of appellants' claim that the verdict may not have been unanimous. The series began toward the end of the second day of deliberations with a jury note (Ex. 15) stating: "We have reached a verdict on four of the defendants. We are sharply and evenly split on the remaining two. We await further instructions from the Court." Defense counsel requested that the jury be asked to return the verdicts they had agreed upon. The District Court refused to ask the jury for a partial verdict and simply instructed the jury to continue deliberating "with a view to reaching a decision on the remaining defendants."

---

trial. ILGWU Local 102 pleaded *nolo contendere* to one count of impeding the performance of duties of the NLRB in violation of 29 U.S.C. § 162 (1976), and the charges against Gerstein were dismissed.

**2.** A motion to recall a mandate is not specifically provided for in the Federal Rules of Appellate Procedure, but was expected by the draftsmen to be available, *see* Advisory Committee Note to Fed.R.App.P. 37 (recall of mandate to make provision for interest), pursuant to Fed.R.App.P. 27. *See* 9 Moore's Federal Practice ¶ 241.02[4] (2d ed. 1980). Presumably, no reacquisition of appellate jurisdiction is needed to deny a petition for rehearing filed after issuance of a mandate. *Cf.* Fed.R.Crim.P. 33 (when appeal is pending in court of appeals,

district court requires remand to grant a motion for new trial, but not to deny such motion).

**3.** The record does not disclose when the mandate from this Court was filed in the District Court, and appellants make no complaint concerning the filing of the mandate in the District Court. We rely upon the issuance of the mandate from this Court as the event that returned jurisdiction to the District Court. However, prompt filing of the mandate in the District Court would be the better practice to provide an official notice in the records of that court. Such filing is the significant event for purposes other than reacquiring jurisdiction, *see, e. g.,* Fed.R.Crim.P. 35(b) (measuring the 120-day period for motion to reduce sentence from "receipt" of mandate).

The next day, shortly after the jury resumed deliberating, it requested legal definitions of key terms in the charge, such as "threat," "conspiracy," and "reasonable doubt." It then sent a second note (Ex. 18) indicating its continued deadlock, stating: "We have reached a unanimous decision on seven counts, but remain hopelessly deadlocked on the remaining five counts."[4] The Court again rejected counsel's request to receive a partial verdict and gave the jury a balanced *Allen*[5] charge. Following a further request to hear some of the recordings, the jury sent the note that is the source of appellants' objection. In this note (Ex. 20), the jury asked: "In count one of the indictment, is it necessary to find the defendant guilty of all acts in the indictment to find him guilty, or can they be separated?"

After consulting with counsel, *see United States v. Ronder*, 639 F.2d 931 (2d Cir. 1981), the Court recalled the jury and responded: "They can be separated." At that point, one juror asked for clarification. The Court responded: "No. They can be separated." Then, apparently preferring to have the request for clarification made precise in written form, the Court added: "Send another note out. They can be separated is the answer." After the jury retired, defense counsel requested that the jurors be specifically instructed that they must be unanimous as to each act they find to be proven. Counsel urged that ambiguity in the question warranted further instruction. The Court declined to charge specifically on unanimity as to acts, expressing the view that the original charge on unanimity sufficed and that the jury could send in another note if it had any further questions or need for clarification.

Within thirty minutes another note (Ex. 21) was received asking: "If a defendant is found innocent under two aspects in count one, and guilty on the rest of the counts [*sic*] under count one, can he be found guilty under count one?" Judge Bramwell read the note to counsel but declined to

hear their suggested responses, contrary to the proper practice set forth in *United States v. Ronder, supra*, which was decided after this trial. Then, instead of responding specifically to the jury's inquiry, which is the preferable course, Judge Bramwell answered by rereading to the jury the portions of the original charge concerning the statute, the elements of the offense in Count One, and aiding and abetting. About ten minutes later, the jury requested to be discharged for the evening because it could not reach a decision that night. On the following day, the jury found appellants guilty on both counts.

■ Appellants contend that the sequence of notes reveals a distinct possibility that the jurors were uncertain as to the requirement of their unanimity and that the District Court's failure to reinstruct specifically on unanimity requires reversal. We disagree. The original charge included the usual instruction on the requirement of a unanimous verdict, and nothing in the jurors' subsequent inquiries revealed any uncertainty about this requirement. Appellants suggest that the note asking "can they be separated?" (Ex. 20) may have sought to inquire whether conviction could result if some of the jurors found one or more alleged acts to have been established and the other jurors found other acts to have been established. We think that is a strained interpretation of the note. The question in the note asking "can they be separated?" was put as an alternative to the question "is it necessary to find the defendant guilty of all acts in the indictment ...?" The plain import of the note, read as a whole, is that the jurors wanted to know if their unanimous verdict must include a finding of guilty as to all acts charged in Count One, or only one or more of the separate acts charged. Nor is uncertainty as to unanimity reflected by the jurors' subsequent inquiry (Ex. 21) asking whether guilt on Count One can be found even if a defendant is innocent "under two

---

**4.** The jury's reference to twelve counts presumably reflects its multiplication of the number of counts, 2, by the number of defendants, 6.

**5.** *Allen v. United States*, 164 U.S. 492, 501–02, 17 S.Ct. 154, 157, 41 L.Ed. 528 (1896).

aspects under count one." On the contrary, this inquiry simply reflects the jury's persistent effort to obtain clarification as to whether all alleged acts had to be proved, most likely to have the law convincingly explained to whichever jurors were not sufficiently enlightened by the Court's laconic response to Exhibit 20.[6]

The record in this case does not disclose ambiguity that would create doubt as to whether the verdicts were unanimous. This case is quite unlike *United States v. Gipson*, 553 F.2d 453 (5th Cir. 1977), on which appellants rely, where the jurors were instructed that they need not all agree on which one of several specified acts the defendant had committed. In any event, in view of the substantial evidence of appellants' guilt, the failure to reinstruct the jury specifically as to unanimity on the substantive count was, at most, harmless error.[7]

*Request for Partial Verdict*

▪ However, we are somewhat troubled by one aspect of the events occurring during the sequence of jury notes—the District Court's response to counsel's suggestion that a partial verdict be received as to some of the defendants. In a multi-defendant trial, the jury is entitled to return a verdict "at any time in its deliberations" as to one or more defendants. Fed.R.Crim.P. 31(b). We have approved the receipt and publication of a jury's partial verdict as to less than all defendants and as to less than all counts. *United States v. Cotter*, 60 F.2d 689 (2d Cir.), *cert. denied*, 287 U.S. 666, 53 S.Ct. 291, 77 L.Ed. 575 (1932); *see United States v. Frankel*, 65 F.2d 285 (2d Cir.), *cert. denied*, 290 U.S. 682, 54 S.Ct. 119, 78 L.Ed. 588 (1933). Plainly Rule 31(b) would be violated if a trial judge were to tell a jury it may not return a partial verdict or were to

refuse a jury's request to return a partial verdict. But that is not what occurred here. Though the jury reported that it had reached verdicts as to some of the defendants, it did not indicate any preference for reporting a partial verdict. The request for return of a partial verdict came from counsel, and it was that request that Judge Bramwell refused.

The difficulties of a jury's task in reaching unanimous verdicts as to several defendants tried on multiple charges counsel against judicial attempts to structure the course of jury deliberations. At the same time, the fundamental precept that guilt is individual must be observed in the deliberative process. For this reason, juries in multi-defendant trials are instructed, as this jury was, to give separate and individual consideration to the case against each defendant. *United States v. Calabro*, 449 F.2d 885, 893 (2d Cir. 1971), *cert. denied*, 405 U.S. 928, 92 S.Ct. 978, 30 L.Ed.2d 801 (1972); *United States v. Kelly*, 349 F.2d 720, 757 (2d Cir. 1965), *cert. denied*, 384 U.S. 947, 86 S.Ct. 1467, 16 L.Ed.2d 544 (1966); E. Devitt & C. Blackmar, *Federal Jury Practice and Instructions* § 11.09 (1977). Regard for these considerations suggests that juries should have considerable latitude in determining for themselves the structure of the deliberative process that will best assure individual consideration of each defendant. The jury's discretion should extend to the timing of reporting its verdicts. If jurors are prohibited from returning a partial verdict as to some defendants, they might mistakenly infer that the individual consideration they had already given to some of the defendants is expected to be reassessed in light of their subsequent deliberations. On

---

**6.** Appellants also suggest that by permitting conviction upon a finding that less than all of the alleged acts were committed, the District Court permitted the jury to convict even though the appellants may have been found innocent of endeavoring corruptly to influence, obstruct, and impede the proper administration of the representation proceeding. But the District Court's charge made clear that the corrupt endeavor was the gist of the offense, which had to be found beyond a reasonable doubt, and

that the alleged acts were the means for accomplishing the endeavor. *Cf. United States v. Amrep*, 560 F.2d 539 (2d Cir. 1977), *cert. denied*, 434 U.S. 1015, 98 S.Ct. 731, 54 L.Ed.2d 759 (1978).

**7.** In view of our disposition, we do not reach the Government's further contention that unanimity is not required as to specifications of the means by which the crime of obstruction of justice was committed.

the other hand, if they are required to return a partial verdict, there is a risk that some jurors might mistakenly permit a tentative vote to become an irrevocable final vote and forgo the opportunity to gain new insights concerning the evidence in one defendant's case from consideration of the same evidence as it bears upon other defendants.

■ We think that juries should be neither encouraged nor discouraged to return a partial verdict, but should understand their options, especially when they have reached a stage in their deliberations at which they may well wish to report a partial verdict as to some counts or some defendants. In this case, the jury reported that it had reached a decision as to four of the defendants, was divided on the remaining two defendants, and awaited further instructions. At that point, particularly in view of counsel's request, an appropriate response from the trial judge should have included a neutral explanation of the jury's options either to report the verdicts reached, or to defer reporting of all verdicts until the conclusion of deliberations. Such an instruction should advise the jurors that any verdicts they choose to report will not be subject to later revision. However, the absence of such an explanation did not deny the appellants any protected right in a case such as this where the jury neither attempted to return a partial verdict nor even asked if it could do so. Moreover, the jury's ultimate decision to convict the two appellants and acquit four co-defendants adequately indicates that individual consideration was given to the case against each defendant. Cf. *United States v. Bubar*, 567 F.2d 192, 205 (2d Cir.), *cert. denied*, 434 U.S. 872, 98 S.Ct. 217, 54 ⌐ L.d.2d 151 (1977).

*Restriction on Consultation with Counsel*

■ On the afternoon of the first of two days of appellant DiLapi's testimony, during cross-examination, the prosecutor sought a brief recess and requested that DiLapi "be instructed on cross-examination not to speak with his attorney." The Court instructed DiLapi that he "not discuss the case until he comes back to the stand," which occurred approximately five minutes later. When counsel objected, the Court responded that it had previously given the "same instruction" to another witness at defense counsel's request, and that "fair is fair." This referred to an episode several days earlier, at the end of a trial day during the cross-examination of a key Government witness, Eason. Defense counsel had asked the Court whether the "usual rule" would prevail that the "witness while under examination should speak to no one." The Court thereupon instructed Eason not to discuss the case with anyone, including the prosecutor, and to "just come back to the stand."

DiLapi maintains that the instruction barring him from any discussion during the recess [8] violated his Sixth Amendment right to assistance of counsel. In *Geders v. United States*, 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976), the Supreme Court held unconstitutional an instruction that the defendant not consult with counsel during an overnight recess between the defendant's direct and cross-examination. However, the Court noted that it was not deciding the constitutionality of a prohibition on consultation imposed during a brief routine recess. 425 U.S. at 89 n.2, 96 S.Ct. at 1335 n.2. This Court had encountered that situation prior to *Geders* in *United States v. Leighton*, 386 F.2d 822 (2d Cir. 1967), *cert. denied*, 390 U.S. 1025, 88 S.Ct. 1412, 20 L.Ed.2d 282 (1968), in which the defendant was barred from consulting with his counsel during a lunch recess that occurred between

8. The Court's reference to its earlier instruction to Eason arguably suggests that the Court intended to restrict DiLapi from consulting with his counsel beyond the five-minute recess. However, we think the record is clear that the instruction did not extend beyond the brief recess and that DiLapi did not think it did. The Government's request was made in the context of a specific brief recess, and the Court's instruction explicitly stated that the prohibition applied until DiLapi returned to the stand. Moreover, neither DiLapi nor his lawyer ever told the District Court they believed themselves barred from consulting beyond the five-minute recess, nor sought relief from any possibly broader prohibition.

the defendant's direct and cross-examination. We disapproved the prohibition in *Leighton,* terming it "plainly uncalled for," *id.* at 823, but declined to order a new trial in the absence of any "actual harm to the right to effective assistance of counsel," *ibid.* In *Geders* the Supreme Court reversed without pausing to inquire as to prejudice, apparently persuaded that foreclosing consultation with counsel inevitably impairs the effective assistance of counsel when the prohibition extends over as long a period as an overnight recess. DiLapi urges us to apply *Geders* to the five-minute recess that occurred here and reverse regardless of whether any identifiable harm resulted. He also contends that there was actual prejudice because he was prevented from discussing with his lawyer a significant event that had occurred earlier in the day, the severance granted to co-defendant Lieberman.

■ We reaffirm our view, expressed in *Leighton,* that it is error to bar a defendant from consulting with his counsel during any trial recess. The fact that other witnesses were cautioned not to speak to anyone during recesses does not justify a prohibition upon defendant-lawyer conversations. The defendant's Sixth Amendment rights were obviously in effect, and he may consult with his counsel during any recess so long as the orderly conduct of the trial is not impaired.[9]

Whether the error warrants reversal in light of *Geders* is a closer question. Some courts of appeals have applied *Geders* to reverse convictions, without inquiring as to actual harm, when communication between defendant and counsel was barred during brief recesses in the middle of the trial day. *United States v. Conway,* 632 F.2d 641 (5th Cir. 1980) (lunch recess during cross-examination of defendant); *United States v. Bryant,* 545 F.2d 1035 (6th Cir. 1976) (lunch recess during defendant's direct testimony); *see United States v. Allen,* 542 F.2d 630 (4th Cir. 1976), *cert. denied,* 430 U.S. 908, 97

S.Ct. 1179, 51 L.Ed.2d 584 (1977) (routine recess; *Geders* applied prospectively because counsel did not object to instruction); *United States v. Vesaas,* 586 F.2d 101, 102 n.2 (8th Cir. 1978) (grave doubts whether brief restrictions during trial recesses can be squared with *Geders;* conviction reversed on other grounds). There is some force to the contention that reversal should always occur because attempts to demonstrate how helpful a consultation would have been may themselves risk some impairment of the right to effective assistance of counsel by intruding upon protected confidences. On the other hand, with the Supreme Court having explicitly limited its holding in *Geders* to an overnight recess and the disapproval expressed in our prior decision in *Leighton* having concerned a lunch recess, we are reluctant to say in the present state of the law that the erroneous instruction requires an automatic reversal in this case.

Assessing the significance of the error, we find not even a remote risk of actual prejudice. DiLapi identifies Lieberman's severance as the topic he was prevented from discussing because of the Court's instruction, yet there is not even a suggestion as to how such a conversation on that topic during the recess might have had any bearing on DiLapi's subsequent cross-examination. Even if there is a reluctance to offer such explanation, the fact remains that the severance had occurred earlier in the day, and DiLapi had some opportunity to consult about it while seated at counsel table and during the lunch recess. Moreover, though counsel objected to the instruction, he gave no indication to the District Court that there was some matter requiring consultation, nor did DiLapi request consultation. We note that when a later recess occurred during cross-examination of a co-defendant, the District Court acceded to that defendant's request to consult with his lawyer. In sum, we see no reason, in the circumstances of this case, for ordering a new trial be-

---

9. There is no claim here that counsel sought to prolong a recess inordinately for extended consultation. Nor do we face, or express any view on, the issue that would arise if a trial judge denied a request for a recess sought during examination of a defendant to enable him to consult with his counsel.

cause of the erroneous instruction. We need not determine whether a similar instruction would require reversal in cases arising hereafter without regard to actual prejudice. It is sufficient to state that the instruction should not again be given.

*Prior Similar Act Instruction*

█ The District Judge gave an instruction concerning prior similar acts, charging the jury, in customary language, that while a prior similar act is not evidence of the commission of an act charged in the indictment, the jury could consider evidence of a prior similar act on the issue of intent, once they determined from other evidence that the act charged in the indictment was committed. In colloquy after the charge was given, the Government urged that this instruction was justified because of the $300 payment Ladmer had offered Eason for his cooperation in withdrawing the Winarick petition. Ladmer challenges the instruction; contending that there was no evidence to indicate that the offer of the $300 was illegal and hence it was not a prior act similar to the one charged in the indictment.

Since the offer of $300 was made long after withdrawal of the Winarick petition, it was not similar to the offers charged in the indictment, which were claimed to be corruptly made to induce withdrawal of a pending petition. Indeed, the Government's theory in summation was not that the $300 offer was a prior example of a payment to induce withdrawal of a petition, but rather a gratuity extended to "grease the skids" for receipt of the payments tendered in connection with the GS petition. Thus, the similar acts instruction should not have been given, *see United States v. Torrence*, 480 F.2d 564 (5th Cir. 1973), even though the evidence of the $300 offer was properly admitted as relevant to intent in connection with the GS petition. Nevertheless, the error was harmless. The instruction made no explicit reference to the $300

offer, and the prosecutor's summation, in referring to the offer, did not try to suggest that it was a prior example of wrongful conduct. There was no appreciable risk that the mere giving of the instruction, unrelated to any specific evidence, branded the appellants as persons involved in prior wrongdoing.

We have considered appellants' other contentions and find them to be without merit.

Affirmed.

MISHLER, District Judge, concurring:

I concur. However, my concurrence does not extend to the views expressed in the majority opinion on the Sixth Amendment violation claim.

Though DiLapi's Sixth Amendment rights were clearly in effect at the time of the five minute recess, I am unconvinced that his Sixth Amendment right to effective assistance of counsel precluded the trial judge from directing him not to discuss "the case" with anyone. The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence." I find that the majority's position—that the Sixth Amendment permits a defendant to "consult with his counsel *during any recess* so long as the orderly conduct of the trial is not impaired," *ante*, at 148 (emphasis added),—is too broad.

Under the circumstances of this case, DiLapi's Sixth Amendment right to counsel was not implicated by the trial court's prohibition. The right to assistance of counsel during defendant's cross-examination while the court is in session is limited to the defense counsel's right, and obligation, to make objection to inappropriate questions and other irregularities which appear during cross-examination.[1] The Sixth Amendment right does not encompass the right to consult counsel during cross-examination.

1. As the majority points out, *United States v. Leighton*, 386 F.2d 822 (2d Cir. 1967), *cert. denied*, 390 U.S. 1025, 88 S.Ct. 1412, 20 L.Ed.2d 282 (1968), concerned a prohibition against attorney-client communications during a recess

that occurred between the defendant's direct and cross-examination. For the reasons set out in my concurrence, I would qualify the majority's interpretation of *Leighton* in accordance with the view herein set forth.

Rather the defendant must rely on, and is amply protected by, the obligation of the court to conduct a fair trial, and its further obligation to preserve the integrity of the judicial process. Accordingly, I find that DiLapi's right to consult with counsel rested exclusively on his right to a fair trial which is guaranteed by the due process clause of the Fifth Amendment.

In reaching this conclusion, I am guided by *Geders v. United States*, 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976), as well as an historical interpretation of the Sixth Amendment guarantee of the right to counsel. In *Geders*, the prohibition against consulting with counsel was with respect to an overnight recess. The objection leveled against that direction at trial was based on the belief that defendant's attorney "had a right to confer with his client about matters other than the imminent cross-examination ...." *Geders v. United States*, 425 U.S. at 82, 96 S.Ct. at 1332. The Court did not hold that the Sixth Amendment necessarily afforded defendant the right to discuss his cross-examination with counsel during a trial recess. Rather, the Court determined that because of the variety of important matters relating to all aspects of the trial which are routinely discussed during overnight recesses, the trial judge's attempt to secure "truth and fairness" in the trial process by prohibiting attorney-client consultations when there had been a perceived "risk of improper 'coaching'" must give way to the defendant's Sixth Amendment right to counsel. *Id.* at 87–91, 96 S.Ct. at 1335–37. In suggesting one method for coping with "the problem of possible improper influence on testimony," the Court alluded to the scope of the right to assistance of counsel during brief trial recesses as follows:

"[T]he trial judge, if he doubts that defense counsel will observe the ethical limits on guiding witnesses, may direct that the examination of the witness continue without interruption until completed. If the judge considers the risk high he may arrange the sequence of testimony so that direct and cross-examination of a witness will be completed without interruption.

\*　　\*　　\*

Inconvenience to the parties, witnesses, counsel, and court personnel may occasionally result ... if a court continues in session several hours beyond the normal adjournment hour.... [However,] convenience occasionally must yield to concern for the integrity of the trial itself." 425 U.S. at 90–91, 96 S.Ct. at 1336 (footnote omitted).

The trial judge's power to continue trial without recess for the purpose of preventing an attorney's improper coaching will not accommodate a construction of the Sixth Amendment which guarantees the defendant a right to consult counsel during cross-examination.

The scope of the Sixth Amendment right to counsel has evolved over the years based on the Court's perception of counsel's importance in "guiding" the defendant through the trial process. *See e. g., Powell v. Alabama*, 287 U.S. 45, 69, 53 S.Ct. 55, 64, 77 L.Ed. 158 (1932) (a layman requires the "guiding hand of counsel at every step in the proceedings against him" because of his lack of "skill and knowledge" in the law); *United States v. Wade*, 388 U.S. 218, 225, 87 S.Ct. 1926, 1931, 18 L.Ed.2d 1149 (1967) (the right to assistance of counsel at pretrial confrontations arises "whenever necessary to assure a meaningful 'defence'"); *United States v. Ash*, 413 U.S. 300, 308–09, 93 S.Ct. 2568, 2573, 37 L.Ed.2d 619 (1973) (the right derives in part from the "desire to minimize the imbalance in the adversary system"). However, conceding the fact that consultation with counsel by a defendant who is undergoing cross-examination is desirable, and may even be necessary, for the purpose of rendering credible testimony, we must also account for the function of cross-examination in the trial process in construing the Sixth Amendment guarantee of counsel.

The age-old tool for ferreting out truth in the trial process is the right to cross-examination. "For two centuries past, the policy of the Anglo-American system of evidence has been to regard the necessity of testing by cross-examination as a vital feature of

the law." 5 Wigmore, Evidence § 1367 (Chadbourn rev. 1974). The importance of cross-examination to the English judicial system, and its continuing importance since the inception of our judicial system in testing the facts offered by the defendant on direct, see U.S.Const. Amend. VI (confrontation clause); *Pointer v. Texas,* 380 U.S. 400, 404, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965); *Douglas v. Alabama,* 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934 (1965), suggests that the right to assistance of counsel did not include the right to have counsel's advice on cross-examination.

The Court has consistently acknowledged the vital role of cross-examination in the search for truth. It has recognized that the defendant's decision to take the stand, and to testify on his own behalf, places into question his credibility as a witness and that the prosecution has the *right* to test his credibility on cross-examination. *See e. g., United States v. Havens,* 446 U.S. 620, 626–27, 100 S.Ct. 1912, 1916–17, 64 L.Ed.2d 559 (government must be permitted "proper and effective cross-examination. . . . "), *reh. denied,* 446 U.S. 620, 101 S.Ct. 25, 65 L.Ed.2d 1172 (1980); *Brown v. United States,* 356 U.S. 148, 154–55, 78 S.Ct. 622, 626, 2 L.Ed.2d 822, *reh. denied,* 356 U.S. 948, 78 S.Ct. 776, 2 L.Ed.2d 822 (1958). Once the defendant places himself at the very heart of the trial process, it only comports with basic fairness that the story presented on direct is measured for its accuracy and completeness by uninfluenced testimony on cross-examination. *Cf. Brown v. United States,* 356 U.S. at 154–55, 78 S.Ct. at 626, *quoting, Fitzpatrick v. United States,* 178 U.S. 304, 315, 20 S.Ct. 944, 949, 44 L.Ed. 1078 (1900) ("[W]e know of no reason why an accused person who takes the stand as a witness should not be subject to cross-examination as other witnesses.").

The assistance which accrues to the defendant by virtue of counsel's presence in the courtroom during defendant's cross-examination needs no discussion here. Surely such assistance is consistent with the plain meaning of that term as it is used in the Sixth Amendment right to counsel clause— i. e., "the right of the accused to have counsel acting as his assistant," *United States v. Ash,* 413 U.S. at 312, 93 S.Ct. at 2575,—and, I believe, in the context of the question before us, it adequately "assure[s] fairness in the adversary criminal process." *United States v. Morrison,* 449 U.S. 361, 364, 101 S.Ct. 665, 667, 66 L.Ed.2d 564 (1981). Accordingly, in light of the relevant history, I conclude that counsel's presence in the courtroom during defendant's cross-examination fully satisfies the Sixth Amendment mandate for the limited purpose indicated.

Having grounded DiLapi's right to confer with counsel while undergoing cross-examination on the Fifth Amendment due process clause, only a showing of a clear abuse of the trial judge's discretion would provide a basis for reversal. *See Geders v. United States,* 425 U.S. at 86–87, 96 S.Ct. at 1334–35. The trial judge, not having abused his discretion, did not violate defendant's right to due process. Accordingly, I find no error in the trial judge's instruction.

