**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0688-19

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

THOMAS N. WALLER,

    Defendant-Appellant.

_____

Submitted May 10, 2021 – Decided June 11, 2021

Before Judges Rothstadt and Mayer.

On appeal from the Superior Court of New Jersey, Law Division, Somerset County, Indictment Nos. 18-04-0207 and 18-04-0208.

Joseph E. Krakora, Public Defender, attorney for appellant (Andrew R. Burroughs, Designated Counsel, on the briefs).

Michael H. Robertson, Somerset County Prosecutor, attorney for respondent (Lauren E. Bland, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Thomas N. Waller appeals from a September 20, 2019 judgment of conviction alleging various trial errors warranting reversal of his conviction and ordering a new trial. We affirm.

Defendant committed two back-to-back home burglaries with co-defendant Ras Lloyd. The men were apprehended during the second burglary, and subsequently charged as co-defendants in separate indictments.

The facts are taken from the trial testimony. Around 9:45 on the morning of February 21, 2018, Sergeant James Kimock of the Watchung Police Department responded to a burglar alarm at a home located on Parlin Lane in Watchung. Sergeant Tim Hale, also of the Watchung Police Department, arrived at the home around the same time as Kimock. At the rear of the home, Kimock noticed the French-style doors were ajar and the door screens were broken. Based on the damage, Kimock and Hale concluded "there was some type of forced entry," and the officers entered the home.

The French-style doors led to a bedroom. The officers noticed jewelry on the bed, open drawers, and various items scattered throughout the bedroom. They completed their search of the home, finding no one inside, and secured the residence so the detectives could investigate the crime scene.

A-0688-19

Thereafter, Detective Sheriff Zaiton of the Watchung Police Department arrived at the Parlin Lane home to take photographs. Zaiton observed the home, and found it to be the same condition as reported by Hale and Kimock. According to Zaiton, the bedroom was "ransacked."

Sergeant Brian Emerick of the Watchung Police Department assisted with the investigation. While Zaiton was taking pictures, Emerick attempted to obtain fingerprints but was unable to get "anything of good detail" and concluded the burglar wore gloves. Emerick, who investigated "at least a dozen" residential burglaries, explained gloves are commonly used in the commission of a burglary.

Thomas Angell and his wife owned the Parlin Lane home. Angell was at work when he received a notification on his cellphone that an alarm had been triggered, indicating "the back bedroom door was open," and "the motion detector had gone off in the bedroom." Angell called the police to report a burglary.

Angell left work and met the police at his home. Upon entering the bedroom, Angell noticed the bed was disheveled and a pillowcase was gone. He then saw jewelry was missing from a small chest on the dresser and jewelry

A-0688-19

boxes in the bedroom closet. He estimated the value of the missing items was in excess of $500.

Later that same day, just before ten o'clock in the morning, the dispatch unit at the Warren Township Police Department received a report of a break-in at a home on Blackthorn Road in Warren. Oliver Manosane, the owner of the Blackthorn Road home, told the dispatcher his neighbor, William Campbell, saw someone in the home. Through a doorbell camera, Manosane witnessed "[a] black man with a clipboard at [his] front door," wearing a construction worker shirt, claiming to be from "Clear View Energy," and an unknown black vehicle parked in the driveway of his home. Thereafter, the camera went dark.[1]

Manosane, who was at work, called 9-1-1, drove home, and met the police at the house. He noticed the front door "was cracked open about two feet" and the door was damaged.

Manosane kept four firearms at his home and told the police about the weapons. Three handguns were secured in safes throughout the house. The remaining firearm, a shotgun, was hidden in an unlocked linen closet in the

---

[1] Manosane installed two cameras at his home. One was installed near his front doorbell and sent notifications to his cellphone when there was motion at the door. The second was a live-feed camera located at the rear of the home.

A-0688-19

master bedroom against the wall behind a laundry hamper. Only Manosane and his wife knew the location of that weapon. The shotgun had rarely been moved from that closet since Manosane bought the home.

Shortly thereafter, Manosane witnessed the police pulling someone out of a window in his home. The individual, later identified as Lloyd, was handcuffed, and placed in a police car.

Upon entering the house, Manosane noted the interior had been ransacked. The police found a gray pillowcase containing the shotgun. Manosane identified the pillowcase as one normally kept on the bed in the master bedroom. In addition, the police found Manosane's 2014 Lexus in the garage with the trunk and both driver's side doors open. Inside the trunk, the police discovered a fluorescent vest, clipboard, and baseball cap. None of these items belonged to Manosane.

Detective Ross Portner of the Warren Township Police Department reported to the Blackthorn Road home. He and Manosane's neighbor secured the exterior of the home until additional officers arrived.

A-0688-19

Detective Jason Moberly of the Watchung Police Department responded to the report of a burglary at the Blackthorn Road home.[2] Upon arrival, Moberly was instructed to position himself on the left side of the home next to the garage window. Seconds after getting into position, "the head of a black male popped out of the window" roughly four feet from Moberly and he instantly "started pulling [the man] out of the window." Moberly identified the man pulled from the window as Lloyd.

After securing Lloyd in a police car, Moberly asked if there was anyone else inside the home. Lloyd said "no." Disbelieving Lloyd's response, Moberly joined other officers in conducting a room-by-room search of the home. As the search continued, Moberly heard a commotion in the basement and saw an individual being led up the stairs. Moberly identified defendant as the suspect found in the basement of the Blackthorn Road home.

The next day, Moberly returned to the Blackthorn Road house to search the suspects' vehicle which remained parked in the driveway of the home. The search uncovered "a number of . . . clear plastic containers and a number of pieces of jewelry." The owner of the Parlin Lane home identified several items

_____

[2] Moberly explained Warren and Watchung are neighboring municipalities and officers from one municipality occasionally responded to emergencies in the other municipality.

6                                              A-0688-19

found in the suspects' car as her missing jewelry. The police also found and returned items taken from Manosane's home.

Patrol Officer David Zavistocki of the Warren Township Police Department responded to the attempted burglary of the Blackthorn Road home. As part of the room-by-room search of the home, Zavistocki entered the basement with another officer. Zavistocki noticed someone hiding underneath the basement stairs and instructed the individual to surrender.

Patrol Officer Thomas Clarke of the Warren Township Police Department responded to the Blackthorn Road burglary. Clarke assisted in the search of the home's interior. While searching the upstairs rooms, Clarke noticed "there was a shotgun in a pillowcase tucked into the corner, as if somebody had moved it and placed it there."

Detective Robert Dinsmore of the Warren Township Police Department also responded to the reported burglary at the Blackthorn Road home. Dinsmore was instructed to "set up" by the suspects' car in the driveway and "saw an individual open the front door wearing [a] safety vest, hoodie." Dinsmore instructed the individual to surrender, but the suspect retreated inside the home. A short while later, Lloyd was taken into custody. However, Dinsmore did not

A-0688-19

recognize Lloyd as the individual attempting to exit the front door. Therefore, the officers searched for other suspects inside the home.

After Lloyd and defendant were arrested and taken into custody, Dinsmore and other officers inventoried items taken from the suspects. The inventoried items from Lloyd included a set of blue rubber gloves, a Clear View Energy identification badge, and $343. Defendant had $60 on his person. The suspects' car was impounded and lawfully searched. Inside the car, the police found a pillowcase, jewelry, and blue rubber gloves.

Forensic Detective Jeff Dockery from the Somerset County Prosecutor's Office collected evidence and took photographs at the Blackthorn Road home. Dockery recalled seeing a black car with the engine running in the driveway. Dockery also saw a vehicle in the garage and seized a variety of evidence out of the trunk of that vehicle, including an "orange vest, a clipboard, and a hat." Manosane told Dockery none of the items found in the trunk of his car belonged to him. Another officer told Dockery one of the suspects was seen wearing these items.

Dockery photographed the home and found the master bedroom in "disarray," explaining "drawers open, items all over the place, so it was, obviously, most likely not in the state that it was left." He also observed a

8

pillowcase with "the barrel of a firearm sticking out of it." In the pillowcase, Dockery found "a bunch of valuable items."

Detective Mark Matthews, a ballistics expert with the Somerset County Prosecutor's Office, testified at trial regarding the shotgun. Matthews received the gun to "test fire[] it for operability" and concluded the gun "was operable as received. Meaning it was capable of discharging . . . projectiles." Matthews explained the firearm had a "pistol grip" and therefore could not legally be considered a "shotgun" since it lacked a butt stock for use as a "shoulder-fired weapon." He testified the weapon was a "12[-]gauge firearm" sometimes referred to as a "non-shotgun-shotgun" since it used shotgun shells but did not meet the definition of a shotgun.[3]

Detective Jack Fuhrmann of the New Jersey State Police maintains the State's firearms records. He explained to possess and carry a firearm in New Jersey, an individual must meet certain qualifications. In April 2018, Fuhrmann received a request from the Somerset Prosecutor's Office seeking firearms information regarding defendant and Lloyd. In searching the State's database, Fuhrmann explained neither defendant nor Lloyd "appl[ied] for or were granted

---

[3] He further testified the firearm measured thirty inches in length and shotguns are required to be twenty-six inches or longer.

any application for a firearms ID card, pistol purchase permit, permit to carry, or permit for an assault weapon."

On April 11, 2018, defendant and Lloyd were charged as co-defendants under Indictment No. 18-04-0207 (Indictment No. 207) with third-degree burglary, N.J.S.A. 2C:18-2(a)(1) (count one), and third-degree theft, N.J.S.A. 2C:20-3(a) (count two). The same day, defendant and Lloyd were also charged under Indictment No. 18-04-0208 (Indictment No. 208) with third-degree criminal mischief, N.J.S.A. 2C:17-3(a)(1) (count one), second-degree burglary while armed with a deadly weapon, N.J.S.A. 2C:18-2(a)(1) (count two), third-degree theft of a firearm, N.J.S.A. 2C:20-3(a) and N.J.S.A. 2C:20-2(b)(2)(b) (count three), third-degree unlawful possession of a shotgun, N.J.S.A. 2C:58-3 and N.J.S.A. 2C:39-5(c)(1) (count four), and third-degree attempted theft of a motor vehicle, N.J.S.A. 2C:5-1 and N.J.S.A. 2C:20-3(a) (count five).[4]

On August 31, 2018, under Rule 3:15-1(a), the State moved to consolidate the two indictments for trial, which a judge granted. A different judge presided over the jury trial conducted between July 8 and July 18, 2019.

---

[4] Lloyd was charged with a sixth count, third-degree hindering, apprehension, or prosecution, N.J.S.A. 2C:29-3(a)(7).

On July 12, 2019, mid-trial, defendant and Lloyd pleaded guilty to counts one and two under Indictment No. 207 related to the burglary at the Parlin Lane home.[5] The State objected to defendant's mid-trial non-negotiated plea and requested a limiting instruction be given to the jury and a stay of the trial. The judge denied the State's applications. At the same time, defendant filed a motion for a judgment of acquittal under Indictment No. 208, which the judge denied.

On July 17, 2019, the jury advised the judge it reached a partial verdict. After discussing the matter with counsel, the judge instructed the jury on partial verdicts and gave the jury the option of submitting the partial verdict or deferring the verdict pending further deliberation. After the judge explained the options, the jury decided to continue deliberating on all counts. The next day, the jury returned guilty verdicts on counts one, two, and three but acquitted defendant on counts four and five under Indictment No. 208.

Defendant was sentenced on September 6, 2019 in accordance with the plea under Indictment No. 207 to five years in prison on each of counts one and

---

[5] The judge allowed defendant to plead guilty to the first burglary at the Parlin Lane home only after opening statements because the judge previously ruled evidence regarding the first burglary was admissible at trial regarding the second burglary at the Blackthorn Road home.

A-0688-19

two.  The sentence imposed under this indictment ran concurrent to the sentence imposed under Indictment No. 208.

After the jury found defendant guilty on counts one through three under Indictment 208, the judge imposed the following sentence.  On count one, defendant was sentenced to four years in prison subject to an eighty-five percent parole disqualifier under the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2., which was to run concurrent with sentence imposed on count two.  On count two, he was sentenced to eight years in prison subject to NERA.  On count three, defendant was sentenced to four years in  prison subject to NERA, which also ran concurrent to the sentences imposed on counts one and two.

On appeal, defendant raises the following arguments:

> I.
>
> THE TRIAL COURT ERRED WHEN IT GRANTED THE STATE'S MOTION TO CONSOLIDATE THE INDICTMENTS INTO A SINGLE TRIAL AND WHEN IT HELD IT WOULD ALLOW THE STATE TO PRESENT EVIDENCE OF THE FIRST BURGLARY AT TRIAL EVEN IF CONSOLIDATION WAS DENIED.

II.

THE TRIAL COURT ERRED WHEN IT DENIED DEFENDANT'S MOTION FOR JUDGMENT OF ACQUITTAL.

III.

THE TRIAL COURT ERRED WHEN IT DENIED DEFENDANT'S REQUEST THAT IT ACCEPT THE JURY'S PARTIAL VERDICT.

IV.

AS THE JURY'S VERDICTS ON COUNTS TWO AND FOUR WERE IRRATIONAL AND CAUSED A MANIFESTLY UNFAIR RESULT, DEFENDANT IS ENTITLED TO A NEW TRIAL.

V.

THE TRIAL COURT'S CUMULATIVE ERRORS DENIED DEFENDANT A FAIR AND RELIABLE TRIAL.

VI.

THE EIGHT-YEAR SENTENCE IMPOSED FOR COUNT TWO UNDER INDICTMENT NO. 18-04-00208-I AND THE FIVE-YEAR SENTENCE IMPOSED FOR COUNT ONE UNDER INDICTMENT NO. 18-04-00207-I, WERE EXCESSIVE AND MANIFESTLY UNFAIR GIVEN THE UNIQUE FACTS OF THIS CASE.

We first address defendant's argument the two indictments were improperly consolidated into a single trial. We disagree.

13

A trial court's decision to join offenses is discretionary and "entitled to great deference on appeal." State v. Brown, 118 N.J. 595, 603 (1990). We only reverse such a decision "if it constitutes an abuse of discretion." State v. Weaver, 219 N.J. 131, 149 (2014).

Our Supreme Court recognized joinder of "similar or related offenses" is preferred "[i]n the interests of [judicial] economy and efficiency." State v. Coleman, 46 N.J. 16, 24 (1966). A trial court may order discretionary joinder of two or more indictments for trial "if the offenses and the defendants . . . could have been joined in a single indictment." R. 3:15-1(a). Two or more offenses may be joined in a single indictment "if the offenses charged are of the same or similar character or are based on the same act or transaction or on 2 or more acts or transactions connected together or constituting parts of a common scheme or plan." R. 3:7-6. "Notwithstanding the preference for joinder, Rule 3:15-2(b) vests a trial court with discretion to order separate trials if joinder would prejudice unfairly a defendant." State v. Chenique-Puey, 145 N.J. 334, 341 (1996). The "defendant bears the burden of demonstrating prejudice." State v. Lado, 275 N.J. Super. 140, 149 (App. Div. 1994).

In determining whether joinder is prejudicial, the critical inquiry is "whether, assuming the charges were tried separately, evidence of the offenses

sought to be severed would be admissible under [N.J.R.E. 404(b)] in the trial of the remaining charges." Chenique-Puey, 145 N.J. at 341 (alterations in original) (quoting State v. Pitts, 116 N.J. 580, 601-02 (1989)). "If the evidence would be admissible at both trials, then the trial court may consolidate the charges because 'a defendant will not suffer any more prejudice in a joint trial than he would in separate trials.'" Ibid. (quoting State v. Coruzzi, 189 N.J. Super. 273, 299 (App. Div. 1983)).

According to defendant, "the sole purpose of consolidation was to increase the likelihood of [his] conviction by showing he had a propensity to commit criminal acts." Because he pleaded guilty to the burglary of the Parlin Lane home under Indictment No. 207, defendant asserts evidence surrounding that burglary should not have been admitted or considered in relation to Blackthorn Road home burglary, arguing "evidence from the first burglary had no evidential value other than to prove [he] committed a prior uncontested crime." Also, he claims the judge failed to provide a limiting instruction to the jury to counteract the possibility of the evidence being improperly considered for propensity.

The consolidation of the Parlin Lane burglary and Blackthorn Road burglary was proper because the burglaries were part of the "same episode." See State v. Gregory, 66 N.J. 510, 519 (1975) ("[D]efendant shall not be subject to

15

separate trials for multiple offenses . . . where the offenses . . . are based on a series of acts or omission motivated by a common purpose of plan which result in the repeated commission of the same offense . . . ."). In deciding whether offenses were sufficiently related, courts have considered the following factors:

> [T]he nature of the offenses, the time and place of each offense, whether the evidence supporting one charge is necessary and/or sufficient to sustain a conviction under another charge, whether one offense is an integral part of the larger scheme, the intent of the accused, and the consequences of the criminal standards transgressed.
>
> [State v. Williams, 172 N.J. 361, 371 (2002) (citing State v. Best, 70 N.J. 56, 62-63 (1976)).]

Based on our review of the record, the burglaries happened one right after the other—immediately after burglarizing the Parlin Lane home, defendant and Lloyd drove to Blackthorn Road, a few miles away, and attempted to commit another burglary using the same modus operandi. Defendant and Lloyd targeted similar items from each home and used pillowcases retrieved from each home to transport the stolen items. Further, items taken from the Parlin Lane home were found at the Blackthorn Road home after defendant's arrest.

The judge acknowledged criminal propensity evidence was prohibited under N.J.R.E. 404(b) but noted discussion of the Parlin Lane burglary was necessary for the witnesses "to tell their story in a natural way." The judge

16

further indicated any improper use of the evidence to show defendant's propensity to commit crime would be counteracted by a limiting instruction if necessary.[6]

Based on our review of the record, the judge correctly concluded evidence related to the Parlin Lane home burglary was necessary to explain "in part . . . how the police came to be at the [Blackthorn Road] residence, what they found there and what its source was." See State v. Rose, 206 N.J. 141, 180 (2011) (allowing evidence that "completes the story" for non-propensity purposes under N.J.R.E. 404(b)). Further, the trial witnesses would have been significantly hindered in offering testimony if they were unable to discuss the details leading to the Blackthorn Road burglary and compare the two burglaries.

---

[6] The judge gave the following limiting instruction to the jury:

> The charge of burglary and theft as to Parlin Lane in Watchung Borough have been resolved. So you will not need to consider those charges nor will you be asked to render a verdict on those charges.
>
> Now your focus will be on the Blackthorn, Warren Township burglary.
>
> Now I caution you, you are not to speculate as to why or how the Watchung charges were resolved . . . I am telling you the Parlin, Watchung Borough charges have been resolved, so not before you.

A-0688-19

We are satisfied defendant failed to demonstrate prejudice as a result of consolidation of the two indictments into a single trial. The probative value of the evidence concerning the burglary of the Parlin Lane home outweighed any resulting prejudice and was necessary to give the jury "background evidence" and "hear the full story of the crime." Rose, 206 N.J. at 181. Moreover, the State used evidence of the Parlin Lane burglary to establish facts other than defendant's propensity to commit criminal acts. Additionally, the judge gave the jury a limiting instruction regarding the Parlin Lane burglary.

We next consider defendant's claim the trial judge erred in denying his motion for a judgment of acquittal under Indictment No. 208 on count two, second-degree burglary while armed with a deadly weapon, and count five, attempted theft of a vehicle. He argues there was insufficient evidence presented at trial to substantiate either of the charges because the facts did not establish: (1) he was ever in the garage to be able to steal Manosane's car or (2) he unlawfully possessed a firearm because the shotgun was actually a pistol and not a shoulder-fired weapon. Further, defendant contends there was no evidence he was ever on the second floor of the Blackthorn Road home or touched the shotgun, and the jury's finding him not guilty on count four, possession of a shotgun, established he did not attempt to steal the shotgun. Based on the

tenuous connection of the State's evidence supporting these charges, defendant argues the judge should have granted his motion for a judgment of acquittal. We disagree.

We review the denial of a motion for a judgment of acquittal de novo, applying the same standard as the trial judge in ruling on the motion. State v. Jones, 242 N.J. 156, 168 (2020) (citing State v. Williams, 218 N.J. 576, 593-94 (2014)). "We must determine whether, based on the entirety of the evidence and after giving the State the benefit of all its favorable testimony and all the favorable inferences drawn from that testimony, a reasonable jury could find guilt beyond a reasonable doubt." Williams, 218 at 594 (citing State v. Reyes, 50 N.J. 454, 458-59 (1967)). The reviewing court "must consider only the existence of such evidence, not its 'worth, nature, or extent.'" State v. Brooks, 366 N.J. Super. 447, 453 (App. Div. 2004) (quoting State v. Kluber, 130 N.J. Super. 336, 342 (App. Div. 1974)). We review "the State's evidence in its entirety, be that evidence direct or circumstantial." Jones, 243 N.J. at 168 (quoting Reyes, 50 N.J. at 459).

Having reviewed the record, the trial evidence was sufficient for a jury to find defendant guilty on counts two and five under Indictment No. 208.

On count two, the State presented sufficient evidence for a reasonable jury to conclude defendant was guilty of second-degree burglary based on the removal of the weapon from its hidden location and placement of the gun in a pillowcase. Although there was no direct evidence defendant handled the shotgun, there was sufficient evidence he constructively possessed the shotgun. "[A] person has constructive possession of 'an object when, although he lacks physical or manual control, the circumstances permit a reasonable inference that he has knowledge of its presence, and intends and has the capacity to exercise physical control or dominion over it during a span of time.'" State v. Morrison, 188 N.J. 2, 14 (2006) (quoting State v. Spivey, 179 N.J. 229, 237 (2004)).

On count five, attempted theft of a vehicle, a reasonable jury could have found defendant guilty based on accomplice liability. The State's evidence established someone tampered with Manosane's car by opening the car's doors and trunk. Also, items belonging to defendant or Lloyd were found inside the car. Depending upon how the jury decided Lloyd's guilt regarding theft of Manosane's car, the jury could find defendant guilty as well.[7]

---

[7] Because the jury found defendant not guilty on count five under Indictment No. 208, there was no prejudice as a result of the judge's denial of the motion for acquittal as to that count.

Here, the State presented evidence defendant and Lloyd entered the Blackthorn Road home as accomplices with the intent to steal valuables after doing the same at the Parlin Lane home. Defendant and Lloyd transported the stolen property in pillowcases taken from each home. The gun from the Blackthorn Road home was found in a pillowcase after being removed from its location in the master bedroom linen closet. According all inferences in favor of the State based on the evidence presented, the facts are consistent with defendant's constructive and joint possession of the shotgun such that a jury could find him guilty of second-degree burglary. Moreover, we agree with the trial judge's rejection of defendant's argument there was a difference between possession of a shotgun and possession of a firearm as "a distinction without a difference."

We next review defendant's claim the judge erred in denying his request to accept the jury's partial verdict on four of the six counts. According to defendant, "[t]he jury clearly signaled that it had been unable to reach a verdict on the more significant charge of second-degree burglary." He also contends the jury's note to the judge "unambiguously indicated it had reached a verdict on specific charges" for the judge to accept a partial verdict.

21

Rule 3:19-1(a) sets forth the procedure for partial jury verdicts, instructing:

> If there are 2 or more counts of an indictment or 2 or more defendants tried together, the jury may return a verdict or verdicts with respect to a defendant or defendants as to whom it has agreed, specifying the counts of which it has agreed; the defendant or defendants may be tried again on the count or counts as to which it has not agreed.

Judges are accorded discretion in accepting a partial verdict provided a partial verdict would not result in prejudice to the defendant. State v. Shomo, 129 N.J. 248, 257 (1992). A partial verdict may be appropriate in instances such as:

> [W]hen the jury has deliberated at length, when the charges against a defendant are rooted in unrelated facts, when the court has reason to be concerned that juror may become ill before deliberations conclude, when there is risk of taint to the jury's decision-making process, or when the State has indicated its intention to dismiss the unresolved counts.
>
> [Id. at 257-58.]

If a jury returns an interim partial verdict, the trial judge "must ensure that the jury intended its partial verdict to be final by specifically instructing the jury regarding the verdict's finality." Id. at 258. A judge should offer "a 'neutral explanation of the jury's options either to report the verdicts reached, or to defer

22

reporting of all verdicts until the conclusion of deliberations.'" Ibid. (quoting State v. DiLapi, 651 F.2d 140, 147 (2d Cir. 1981)). In instructing the jury, the judge "should inform the jury unambiguously, before the court receives the verdict, that its partial verdict will be treated in all respects as a final verdict, not subject to reconsideration, even though the jury will continue deliberations on other counts." Ibid. If a judge fails to instruct a jury on the finality of a partial verdict, the defendant's right to a unanimous jury verdict could be tainted. Ibid.

Having reviewed the record, we are satisfied the judge followed the proper procedure in instructing the jury after receipt of the jury's note on July 17, 2019. The note read, "We have reached a verdict on four of the six charges. We have failed to reach a verdict on the other two." Before soliciting counsels' positions on the subject of the jury's note, the judge provided counsel with a copy of the model charge on partial verdicts and stated:

> [W]e don't know whether the partial verdicts that they reference are on specific counts, referencing one or the other defendant. In other words, we don't know whether they are count specific or defendant specific and, of course, we don't know which four they have arrived at a verdict on and which two they have failed to.

23

The judge and counsel discussed the implications of a partial verdict and how to proceed. Defense counsel told the judge:

> I am not certain in many ways I'll defer to [the State, co-defendant's counsel,] and yourself. In some ways it feels that given some version of the Allen [v. United States, 164 U.S. 492 (1896),] charges and some indication that generally the law disfavors partial verdicts . . . ultimately, you know, we appreciate your efforts thus far might be the correct way to deal with it and however you wish to deal with it, your Honor.
>
> . . . [T]here was a fire alarm also today. They were only out for half hour Monday and they did have a question yesterday. So, potentially, it would be fantastic in a lot of ways if you were able to resolve it one way or another.

The judge reconstructed the duration of the jury's deliberation, calculating, at maximum, the jury had been deliberating for eight and a half hours. There was no indication from the note the jury was deadlocked. Based on these facts, the judge decided to give the partial verdict instruction and encourage the jurors to consider if they wanted to deliberate further or make the partial verdict final. The judge instructed the jurors as follows:

> I have discussed the note and the questions which it raises. I have consulted with counsel on that and I have the following advice for you.
>
> You have indicated, ladies and gentlemen, that you have reached a partial verdict. I want to instruct

24

you and advise you of the consequences of what we call a partial verdict.

If you decide to report a partial verdict, that is report a verdict on four of six counts, that verdict will be final. I will send you back in to continue deliberation on the remaining two counts and await your further advice on those two counts. But you will not be able to revisit or reconsider the verdict on the four counts, which you have reported. Okay. You will, therefore, have the option after some discussion among you outside my presence of returning a partial verdict, which is I have just told you will be final, and then you'll continue deliberations on the remaining two counts or you can tell me we are going to continue deliberations on all six counts.

The problem with partial verdicts is that they have the potential to interfere with ongoing jury deliberati[on] by prematurely freezing a jury's decision on a partial verdict. You know evidence is intertwined and the problem with the partial verdict is, it is final on those four counts. No going back. No reconsideration. So it could have the potential to distort the jury's deliberative process.

What is most important, however, is that I cannot and must guard against interfering with your deliberations. They are yours. You are the judges of facts. And I must preserve the jury's independen[ce] in that deliberative process.

The judge then told the jurors to discuss how they wanted to proceed and, depending on the decision, the judge would issue further instruction. Later that day, the jury stated, "Thank you. We have decided to continue deliberation on

A-0688-19

all six charges." At ten o'clock the next morning, the jury delivered a unanimous verdict on all counts.

We find no error in the judge's instruction to the jury regarding the verdict. The judge was not required to accept the jury's partial verdict. He discussed the partial verdict charge with counsel prior to instructing the jury and then issued the model jury charge on partial verdicts consistent with <u>Shomo</u>. The judge carefully explained to the jury, more than once, the decision whether to continue deliberating was solely its own. Ultimately, the jury chose to continue deliberating on all counts. Under these circumstances, there was no error in the judge's instruction regarding the partial verdict.

We next consider defendant's argument the jury's guilty verdict on count two, second-degree burglary while armed with a deadly weapon, and count three, third-degree theft of a firearm, was inconsistent with the jury's not guilty verdict on count four, third-degree unlawful possession of a shotgun. He contends the verdicts were irrational and he was entitled to a new trial as a result. We disagree.

Even if we agreed the verdicts were inconsistent, which we do not, inconsistent verdicts are permissible in this State. <u>State v. Grey</u>, 147 N.J. 4, 11 (1996). "[I]nconsistent verdicts are acceptable and non-reviewable." <u>State v.</u>

<u>Banko</u>, 182 N.J. 44, 53 (2004) (citing <u>United States v. Powell</u>, 469 U.S. 57 (1984)). An inconsistent verdict will stand so "long as there is sufficient evidence to permit a rational factfinder to find a defendant's guilt beyond a reasonable doubt on the charges on which the defendant was convicted." <u>State v. Ellis</u>, 299 N.J. Super. 440, 455-56 (App. Div. 1997).

Here, to the extent the verdicts were inconsistent, the jury's verdicts were acceptable based on the State's evidence regarding defendant's guilt.[8] During deliberations, the jury sent a note to the judge asking, "Why is 3 'theft of a firearm' and 4 'possession of a shotgun'. Does it matter . . . ?" The jury's request for clarification did not render the jury's verdict invalid. Moreover, defendant never argued the jury instructions provided by the judge were inadequate or confusing.

Here, the State provided evidence defendant and Lloyd were accomplices who intended to burglarize the Blackthorn Road home and used a pillowcase to steal the shotgun, which had been removed from its original location in a

---

[8] Any inconsistency may be resolved based upon the language in counts three and four. Count three referred to theft of a "firearm" while count four addressed possession of a "shotgun." Because the weapon found in the pillowcase lacked a butt stock associated with a typical shotgun, it did not meet the legal definition of a shotgun. This may explain, in part, why the jury found defendant possessed a "firearm" but not a "shotgun."

bedroom closet of that home. Based on these facts, the jury had ample evidence in the record to support a conviction for second-degree burglary and theft of a firearm.

While defendant argues there were cumulative errors depriving him of a fair trial, our review of the record finds no support for any errors committed by the trial court. "[T]he theory of cumulative error will . . . not apply where no error was prejudicial, and the trial was fair." State v. Weaver, 219 N.J. 131, 155 (2014) (citing State v. D'Ippolito, 22 N.J. 318, 325-26 (1956)). Having rejected defendant's argument there was reversible error during the trial, we reject his cumulative error argument. Defendant received a fair trial, the jury's verdict was supported by the evidence, and a new trial is not warranted.

We also reject defendant's claim the sentence imposed was excessive and manifestly unfair under the "unique facts of this case." Sentencing determinations are reviewed for abuse of discretion, State v. Jones, 232 N.J. 308, 318 (2018). "[I]n accordance with a deferential standard," State v. Fuentes, 217 N.J. 57, 70 (2014), we do not substitute our own evaluation of the aggravating and mitigating factors for that of the sentencing court. State v. Case, 220 N.J. 49, 65 (2014). We will affirm a trial judge's sentence where the judge's evaluation of aggravating and mitigating factors was based on competent

A-0688-19

credible evidence in the record and the sentencing guidelines were followed. State v. Roth, 95 N.J. 334, 365-66 (1984).

The judge found the presence of aggravating factors three (the risk of committing another offense), six (prior criminal record and seriousness of present offense), and nine (the need to deter). The judge explained, "Based upon the consistency and pernicity of defendant's prior criminal record and his engaging in criminal conduct, there is certainly a risk that [he] will commit another offense and there is a compelling need to deter him and others from violating the law." In reviewing the mitigating factors, the judge concluded only mitigating factor six, willingness to compensate the victim, applied. As a result, the judge concluded the aggravating factors outweighed the mitigating factor and sentenced defendant within the range permissible under the sentencing guidelines.

We are satisfied the judge engaged in a factored analysis and provided adequate reasoning in support of that analysis. The judge was not required to explicitly review and reject every individual factor asserted by defense counsel.

Defendant also claims the judge erred by stating on the record he was convicted on count four. During the sentencing hearing, the judge mistakenly stated defendant was found guilty on count four. Neither the State nor defense

counsel correct this misstatement during the sentencing hearing. However, the judgment of conviction (JOC) did not reflect the judge's misstatement.

While defendant contends this was a "material" mistake requiring a remand, the JOC properly reflected the correct sentencing for counts one, two, and three, and stated defendant was acquitted on counts four and five consistent with the jury's verdict. Defendant fails to explain how the misstatement adversely affected his sentence. Defendant was sentenced in accordance with the sentencing guidelines and the judge's misstatement on the record was not repeated in the filed JOC.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0688-19